**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOHN LONDON and JACQUELYN
LONDON, Administrators of the
Estate of John Dewees London, II,
Plaintiffs-Appellants,

v.

No. 97-1042

ALFONZA HAMILTON; THE CHARLOTTE
POLICE DEPARTMENT; CHIEF OF
POLICE OF THE CHARLOTTE POLICE
DEPARTMENT; THE CITY OF
CHARLOTTE,
Defendants-Appellees.

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
H. Brent McKnight, Magistrate Judge.
(CA-95-347-3-McK)

Argued: March 5, 1998

Decided: April 22, 1998

Before LUTTIG and WILLIAMS, Circuit Judges, and CLARKE,
Senior United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Pamela Anne Hunter, Charlotte, North Carolina; Ned
Clifton Cannon, Jr., Gastonia, North Carolina, for Appellants.

W. Clark Goodman, WOMBLE, CARLYLE, SANDRIDGE & RICE, Charlotte, North Carolina, for Appellees. **ON BRIEF:** G. Michael Barnhill, WOMBLE, CARLYLE, SANDRIDGE & RICE, Charlotte, North Carolina; Stephanie Webster, Deputy City Attorney, CITY OF CHARLOTTE, Charlotte, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

John London and Jacquelyn H. London, administrators of the estate of their deceased son, John DeWees London, II, ("London") filed suit pursuant to 42 U.S.C.A. §§ 1983 (West Supp. 1997) & 1988 (West 1994 & Supp. 1997) and N.C. Gen. Stat. § 28A-18-2 (Michie 1997), against Alfonza Hamilton, an officer of the Charlotte Police Department, and the Chief of Police of the Charlotte Police Department, in their individual and official capacities; the Charlotte Police Department; and the City of Charlotte (collectively "Appellees"). The Londons appeal the magistrate judge's* opinion and order granting Appellees' motion for summary judgment in its entirety, arguing primarily that the district court erred in determining that the officers' use of deadly force was objectively reasonable under the circumstances. We affirm the district court's judgment because the officers' belief that London posed a significant threat of death or serious physical injury to themselves or others was reasonable under the circumstances.

We review a district court's grant of summary judgment de novo. See Higgins v. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th

_____

*The parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C.A. § 636(c)(1) (West 1993). For convenience, we refer to the magistrate judge as "the district court" throughout the opinion.

2

Cir. 1988). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex v. Catrett, 477 U.S. 317, 322 (1986). When considering whether summary judgment is proper, all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970). Viewed in the light most favorable to the Londons, the facts are as follows.

London, the decedent, had a history of severe mental illness. He was first hospitalized in 1989 and was diagnosed as a paranoid schizophrenic. London was subsequently committed involuntarily for psychiatric treatment on numerous occasions by his mother, Jacquelyn London. At the time of the events giving rise to this appeal, London resided with his mother in Charlotte, North Carolina.

On September 18, 1993, at approximately 9:00 p.m., Jacquelyn London, her daughter Crystal, and her sister-in-law returned to Jacquelyn London's home from shopping. London was in his room with the door locked. As she was preparing for bed, Jacquelyn London noticed that the loaded .38 caliber pistol that she kept on top of the television in her bedroom was missing. Fearing that London had the gun, Jacquelyn London, Crystal, and the sister-in-law left the residence.

At 11:50 p.m., from a nearby convenience store, Crystal called 911 and asked for the police. Minutes later, several Charlotte Mecklenburg Police Department officers arrived at the convenience store and met with the London family. Crystal requested that the officers go into the residence and remove the gun from her brother's possession. The officers advised the London family that they could not forcibly enter the residence and remove the gun without a warrant or involuntary commitment papers. Nevertheless, the officers accompanied the London family to the residence, briefly searched the residence, and knocked on London's bedroom door. They received no response.

Meanwhile, Sergeant Davis attempted to phone London, but London did not answer the telephone. Sergeant Davis then attempted to

3

contact London's psychiatrist. London's psychiatrist was not available, so Sergeant Davis spoke with the psychiatrist on call, who recommended either leaving London in his room until he was ready to come out on his own or obtaining involuntary commitment papers. The London family continued to insist that the officers forcibly enter London's bedroom and take the gun away from him. The officers refused to do so without a warrant or involuntary commitment papers, so the London family and the officers left the residence.

At approximately 2:30 a.m., the local magistrate's office radioed the Charlotte Police Department and told the dispatcher that involuntary commitment papers had been prepared for London and asked the dispatcher to have London picked up and taken to Cedar Springs hospital. The on-duty Captain sent a Special Weapons and Tactics Unit (SWAT) team to the residence because of the potential danger London posed to himself and others.

When the officers entered the house to serve the commitment papers on London, London came out of his room armed with the pistol. Officer Chipman pointed his gun at London and asked him to drop the weapon. London did not drop the gun and ordered the officers to leave the house. When the officers refused to leave, London asked Officer Chipman to shoot him. Officer Chipman cautiously persuaded London to go back into his bedroom.

London later came back out of his room and sat down on a couch in the upstairs loft area with his back to the officers. The officers continued to plead with London to drop the weapon and told him that they were there to help him. London's father arrived and also begged him to put the gun down. All attempts to plead with London failed. The officers considered the possibility of using tear gas, but rejected it because of the proximity of their own personnel and the potential for startling London.

After some time, London went to the top of the stairs, sat down on the top stair, and began sliding down the stairs one stair at a time. London still had the pistol in his right hand with his hands resting on his thighs. Sergeant Baker was standing barely within the front doorway of the residence, shielded by a ballistic shield. Officer Hamilton was also standing near the doorway, but Officer Hamilton's head and

4

the left side of his body were completely exposed. Sergeant Baker and Officer Hamilton continued to ask London to drop the gun, repeatedly stating, "[d]on't do it." (J.A. 44). London finally stopped on the seventh step and made eye contact with Officer Hamilton. London was within six to seven feet of Sergeant Baker and Officer Hamilton. London raised the pistol, pointing it at Sergeant Baker and Officer Hamilton. Sergeant Baker squeezed his pistol, preparing to fire. Officer Hamilton, fearing for Sergeant Baker's and his own safety, fired one shot from his shotgun which struck London in his chest, left arm, and hand, resulting in London's death.

The Londons argue that the officer's actions were unreasonable because they could have used safer alternatives to deadly force such as remaining outside the house, using a hostage negotiator, or simply doing nothing. The district court determined, however, that Officer Hamilton's fear for his own and Sergeant Baker's safety was objectively reasonable and that his use of force was not excessive and, therefore, granted summary judgment on the Londons'§ 1983 claims. Alternatively, the district court held that Officer Hamilton was entitled to qualified immunity on the Londons' § 1983 claims. Since the district court found there was no underlying constitutional violation and Officer Hamilton was entitled to qualified immunity, the district court held there was no municipal or supervisory liability against either the Chief of Police or the City of Charlotte. In addition, the district court concluded that under North Carolina law the Charlotte Police Department is not a legal entity subject to being sued. The district court additionally found that Officer Hamilton acted reasonably in his use of deadly force pursuant to state law and granted summary judgment on the Londons' state law wrongful death claim pursuant to N.C. Gen. Stat. § 28A-18-2 (Michie 1997). Finally, the district court granted summary judgment on the Londons' state law claims for negligent employment and supervision, finding that Officer Hamilton did not act negligently and there was no evidence of any prior acts of negligence by Hamilton.

We have reviewed the record, briefs, and pertinent case law in this matter, and we have had the benefit of oral argument. Our careful review persuades us that the rulings of the district court were correct. Accordingly, we affirm on the reasoning set forth in the district court's thorough opinion. See London v. Hamilton , C.A. No.

5

3:95CV347 (W.D.N.C. Nov. 26, 1996).

AFFIRMED

6